# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

## ELKINS DIVISION

KENNETH M. MCGOUGH,

        Plaintiff,

v.

                                 CIVIL ACTION NO. 2:05-cv-00074

NALCO COMPANY,

        Defendant.

## MEMORANDUM OPINION AND ORDER

On November 15, 2006, the court received the mandate from the Fourth Circuit Court of Appeals vacating the order denying injunctive relief and remanding the case to this court. Though the Fourth Circuit found no error in the denial of the preliminary injunction on the contractual non-competition claim, the order was vacated and the case remanded for further proceedings to address the nondisclosure and trade secret claims.

The court finds that there is no need to hold an additional hearing as the parties fully briefed and had the opportunity to offer evidence and to argue the nondisclosure and trade secret claims at the preliminary injunction hearing held by this court on January 25 and 26, 2006.

As no error was found in the court's holding on the contractual non-competition claim, I find it expedient to adopt the prior findings and reincorporate them below. I will insert discussion of the trade secret and non-disclosure claims at appropriate points. In the interest of making this order as transparent as possible to the parties I have set out in bold any insertions, additions, and clarifications that I have made to my prior opinion.

## I. Findings of Fact

The court made extensive findings of fact in its first memorandum opinion and order. They are reincorporated in full below.[1]

The defendant, Nalco Company, is a water-treatment chemical company. Nalco is a Delaware corporation that maintains its principal place of business in Naperville, Illinois. The company has grown dramatically in the last thirty years and has approximately 10,000 employees servicing 60,000 customers in 130 countries. Nalco sells water-treatment chemicals and services to a plethora of industries. This case specifically concerns Nalco's work in the coal mining industry. Nalco sells chemicals and provides services to enhance the coal cleaning process and to improve the value of mined coal. Nalco's coal mining group, approximately twenty people exclusively dedicated to coal mining-related sales and services, does business primarily in the coal states east of the Mississippi River—West Virginia, Illinois, Indiana, Virginia, Ohio, Pennsylvania, Kentucky, and Alabama. The coal mining group assists coal preparation plants by providing fine coal recovery services. Fine coal recovery is accomplished by coal flotation, a process that makes coal particles rise to the surface when submerged. This process allows coal companies to recover bits of coal as small as 0.1 millimeter in size. **There are about sixty coal processing plants. The names of these plants are commonly known in the industry. It takes Nalco twelve to eighteen months to develop a chemical program for a customer. It develops a specific blend or chemical program for each customer.**

---

[1]For the full text of the original memorandum opinion and order in this case please see *McGough v. Nalco*, 420 F. Supp. 2d 556 (N.D.W. Va. 2006).

Nalco hired Kenneth McGough, the plaintiff, as a sales representative on November 6, 1978. Mr. McGough, who had an undergraduate degree in mining engineering and a masters degree in mineral processing, had been working for U.S. Steel for the previous eighteen months. Nalco hired the twenty-four year old Mr. McGough during an interview at the company's headquarters in Illinois. Although no written employment contract was made, Mr. McGough entered an oral, at-will employment contract with Nalco to work as a sales representative in the Alabama coalfields and receive an annual salary of $22,000.[2] As a sales representative, his job was to sell Nalco products to the coal preparation plants in Alabama. Mr. McGough's employment with Nalco commenced on November 6, 1978.

Approximately ten days later, after Mr. McGough had resigned his job with U.S. Steel, he received Nalco's "Field Representative Agreement"—the subject of this litigation—in the mail. Nalco's Field Representative Agreement is a standard form that is not employee- or job-specific. **The Field Representative Agreement contains the nondisclosure and noncompete provisions at issue in this litigation.** A factual dispute exists as to whether Nalco advised Mr. McGough he would have to sign such an agreement when he interviewed in Illinois. Although Nalco attempted to prove that the agreement was discussed when the oral employment agreement was entered into, the attempted proof was unpersuasive. The Field Representative Agreement specifies that Mr. McGough will not disclose any of Nalco's trade secrets nor can he compete with Nalco in any

---

[2]     David Hawley, the individual who interviewed and offered employment to Mr. McGough, has passed away. According to Mr. McGough, he flew to Illinois on a Sunday night, accepted the job from Mr. Hawley on Monday morning, flew back to Alabama at noon, and worked the evening shift for U.S. Steel that night.

similar line of business for a period of two years following his departure from the company. **It provides in relevant part**:

> **2. Employee shall not, directly or indirectly, under any circumstances or at any time, either during his employment by Nalco or after its termination, communicate or disclose to any person, firm, association or corporation, or use for his own account, without Nalco's consent, any information acquired by him in the course of, or incident to his employment, relating to or regarding any inventions, discoveries, improvements, machines, devices, processes, products, formulae, designs, projects, mixtures and/or compounds, whether patentable or not (hereinafter collectively called "technical information") that may have been, are now, or may hereafter during the term of his employment by Nalco be made, used, devised, considered or investigated by Nalco or Third Parties, and he will at all time keep secret and hold inviolate said technical information, the Employee hereby agreeing that all the foregoing has been and shall be received by him as confidential communications: provided, however, that the obligations of this paragraph shall not apply in the event and to the extent that the aforesaid matters are or become generally known to and available for use by the public otherwise than by the act or commission of Employee, except that Employee shall in no event, at any time, without Nalco's consent, disclose any identity or correlation between matters publicly known and available and Nalco's technical information or said Third Parties' technical information.**

> 3. Employee shall not, directly or indirectly, under any circumstances or at any time, either during the term of his employment or after its termination, communicate or disclose to any person, firm, association or corporation, or use for his own account, without Nalco's consent, any information acquired by him in the course of or incident to his employment relating to or regarding the names of customers of Nalco or Third Parties, the sales or service data of Nalco or Third Parties, furnished to him or secured by him in the course of his employment, or any other data or information concerning the business and activities of Nalco or Third Parties.

> \* \* \*

> 5. Employee will not, directly or indirectly, during his employment and for the period of two (2) years immediately after its termination, engage or assist in the same or any similar line of business, competing with the line of business now or hereafter conducted or operated by Nalco during the term of Employee's employment by Nalco, whether as consultant, employee, officer, director, or representative of such competing business, within the United States of America, provided, however, that in the event that the Employee's position with Nalco immediately prior to termination is that of field representative, then the geographic area of this non-competition covenant shall be limited to that geographic area within the United States of America for which Employee was responsible at any time during the two

4

year period immediately preceding termination, and provided, further that in the event that any court of competent jurisdiction shall find that the above restrictions are unreasonable with respect to their territorial extent and/or period of time involved, that such finding shall not invalidate any of the foregoing provisions with respect to the territorial extent or period of time which is reasonable, and said restrictions shall be construed to apply only to the territory and period of time so found to be reasonable by said court.

When Mr. McGough received the Field Representative Agreement, he contacted Jan Beardsley, his district manager in Baton Rouge, Louisiana, who advised Mr. McGough he must either sign the agreement or surrender his position. Mr. Beardsley explained that the Field Representative Agreement was a standard form for Nalco employees. Mr. McGough signed the agreement on November 16, 1978, and mailed it to Nalco's headquarters in Illinois. This Field Representative Agreement was never supplemented or amended.

Mr. McGough worked in Alabama as a Nalco sales representative until 1989. While in Alabama, Mr. McGough helped Nalco significantly increase its business in that state. Nalco had the business of two coal preparation plants in Alabama in 1978, but had the business of approximately eight plants when Mr. McGough left the state in 1989.

In the spring of 1989, Mr. McGough claims he resigned his position with Nalco and took a job with Custom Creations, a van customizing company, in Birmingham. Nalco disputes this contention vehemently and argues Mr. McGough never resigned. In fact, Nalco contends it continuously employed Mr. McGough from November 1978 through June 2005. Based upon the limited facts introduced into evidence on this point at the hearing, the court is unable to determine whether Mr. McGough actually resigned from Nalco in 1989 to work for a van customizing company. The strong possibility that he did, however, is an important fact and will be discussed in detail. *Infra* Part II.C.3.

Whether Mr. McGough did or did not resign from Nalco in 1989, the company flew Mr. McGough and his wife to Charleston, West Virginia, to meet with Larry Hyatt during March or April of 1989. Shortly thereafter, Mr. McGough moved his family to West Virginia and became a sales representative under Mr. Hyatt. Mr. McGough did not sign any new contracts regarding employment, competition **or non-disclosure** with Nalco at this time. Mr. McGough's designated sales territory was Boone County, several accounts in Kanawha County, and one in Braxton County; Nalco also expected him to pursue new accounts in the area.

In 1991, Mr. McGough transferred into Nalco's industrial group and moved back to Birmingham. According to Mr. McGough, the transfer was completely voluntary. In addition to pressure from his family to return to Alabama, he wanted "to get out of coal for a while, try another industry." (Jan. 26 Hr'g Tr. 24:18–24.) Even though he transferred groups within Nalco, he did not sign any new contracts regarding employment, competition **or nondisclosure** with Nalco at this time. After a little less than a year, Mr. McGough returned to Nalco's coal mining group in West Virginia, where he resumed his duties as a sales representative. Mr. McGough claims the work in the industrial group was too chemistry-oriented. In his opinion, had he continued working with that group, Nalco would have had to fire him because of his lack of chemical expertise. (*Id.* 25:12–19.)

In 1994, Nalco promoted Mr. McGough to the position of account manager, which essentially involves the same duties as a sales representative only with some added recognition. In 1996, Nalco promoted Mr. McGough again, this time to the position of manager of technical services. He assumed responsibility for Roger Carter—a consultant—and three employees working in the Richlands, Virginia equipment group. As a manager of technical services, Mr. McGough was

responsible for assembling the employees necessary to repair any service problems occurring at coal preparation plants. According to Mr. McGough, this job did not involve a sales component.

Following Nalco's dissolution of the group Mr. McGough was supervising, he took the position of area sales manager for southern West Virginia at the beginning of 1998. In this position, Mr. McGough had three sales representatives reporting directly to him and was responsible for the area between Beckley, Williamson, and Charleston. He again reported to Larry Hyatt until Mr. Hyatt retired on December 1, 1998. When Mr. Hyatt retired, Nalco changed Mr. McGough's job title again by making him a consultant that reported to David Brightbill.[3] He remained in this position until Nalco reorganized the group, when Nalco had the employees better at sales focus on acquiring new business and those better at service focus on retaining customers. After the reorganization, the employees focusing on service reported to Mr. McGough, who was considered a service manager. During this time, Nalco partially paid for Mr. McGough to pursue a Ph.D. at Virginia Tech.[4]

In 2003, Nalco made Mr. McGough an industry technical consultant, the position he held until he resigned in 2005. As an industry technical consultant, Mr. McGough began reporting internally through Nalco's marketing branch and was responsible primarily for servicing coal preparation plants; previously, Mr. McGough always had reported internally through Nalco's sales branch. Mr. McGough was one of two Nalco industry technical consultants in the coal industry at the time. According to Mr. Brightbill, it would take years to train someone to be able to perform the duties of an industry technical consultant. In addition to performing his duties as an industry

---

[3]     Mr. McGough believes that the change from area sales manager to consultant was a demotion. (*Id.* 28:22–23.)

[4]     Although Mr. McGough has completed all of the coursework necessary to receive a Ph.D., he still must complete a dissertation to receive the degree.

technical consultant, Mr. McGough was forced to undertake some sales responsibilities in West Virginia to fill in for departures by several Nalco sales representatives. In the last two years of his employment, while serving as an industry technical consultant, Mr. McGough helped service coal preparation plants in West Virginia, Kentucky, Illinois, Indiana, Virginia, Pennsylvania, Alabama, Washington, and western Canada.[5]

On June 29, 2005, Mr. McGough gave notice to Nalco of his resignation. According to Mr. McGough, he decided to resign because of the intense workload he had as an industry technical consultant and because most of the Nalco people he was closest to had left the company. Specifically, Mr. McGough stated, "I was not happy with a lot of things. I was not happy with the workload. I was not happy with the way I was compensated. I was not happy with what had happened to our sales force, particularly in West Virginia." (Jan. 25 Hr'g Tr. 162:21–25.) He explained that a lot of his good friends who used to work for Nalco departed for reasons including lay offs or transfers, resignations, and retirements. (*Id.* 163:1–9.) Mr. McGough noted that the job became "drudgery" to him and he no longer looked forward to going to work. (*Id.* 163:14–16.) He said, "in the end I was the only guy left bringing in a lot of new guys that were not coal mining guys that were, I'll use the term wearing their first pair of work boots." (*Id.* 163:10–12.) His last day of work was on or about July 12, 2005. Nalco attempted to change Mr. McGough's mind, but those efforts proved unsuccessful. Nalco also attempted to hire Mr. McGough as a part-time consultant to work three days a week. Nalco, however, would not give Mr. McGough the details of the offer

---

[5]    Mr. McGough also helped service a plant in North Carolina, but the plant was not involved in coal preparation.

until he signed a five-year confidentiality agreement, which he refused to do. Nalco has been unable to hire a replacement for Mr. McGough since his departure.

Mr. McGough now is working for Appalachian Chemical Services ("ACS"), a company formed by Larry Hyatt in March 2005.[6] ACS, a Nalco competitor, provides consulting services to coal preparation plants to which it sells chemicals. Mr. McGough's primary job is to provide technical service to ACS customers. ACS pays Mr. McGough $10,000 a month. He began providing technical service to ACS on August 1, 2005. The majority of Mr. McGough's work done for ACS consists of rendering service to former Nalco customers. Since Mr. McGough left Nalco, ACS has procured the business of at least three former Nalco customers: Brooks Run Coal Company ("Brooks Run"), Terry Eagle Coal Company ("Terry Eagle"), and a plant owned by Fola Coal Company ("Fola No. 2"). **Mr. McGough has not disclosed to ACS or other customers any of the chemical blends that he used or learned of while working at Nalco.**

On June 29, 2005, the same day Mr. McGough gave notice to Nalco of his resignation, he filed the pending action in the Circuit Court of Webster County, West Virginia, for a declaration of the parties' rights related to the Field Representative Agreement or any other agreements they might have. Nalco removed the action to this court on September 27, 2005.[7] On that same day, Nalco filed both a counterclaim against Mr. McGough for breach of contract and the pending motion for a preliminary injunction that would enjoin and prohibit Mr. McGough from competing with Nalco and disclosing any trade secrets.

---

[6] For the previous four years, Mr. Hyatt worked for Freedom Chemical, another competitor of Nalco.

[7] Removal was timely because Mr. McGough did not serve the Complaint on Nalco until September 19, 2005.

## II. Preliminary Injunction Standard

The Fourth Circuit explained the analysis a district court must employ for determining whether to issue a preliminary injunction in *Blackwelder Furniture Co. v. Seilig Manufacturing Co.*, 550 F.2d 189, 196 (4th Cir. 1977). First, the court must compare the likelihood of irreparable harm to the party seeking the injunction should the court not issue an injunction with the potential harm to the opposing party should the court issue an injunction. If this balancing of hardships tips decidedly in favor of the party seeking the injunction, the district court can grant a preliminary injunction as long as the dispute presents a serious issue for litigation and the injunction would not undermine the public interest. *Merrill, Lynch, Pierce, Fenner & Smith v. Bradley*, 756 F.2d 1048, 1054–55 (4th Cir. 1985). The party seeking the injunction does not have to make a strong showing of the likelihood of succeeding on the merits if the balancing of hardships weighs strongly in that party's favor. *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1992). "This is because the hardship balancing test is a 'sliding scale' approach and 'the more the balance of irreparable harm inclines in the plaintiff's favor, the smaller the likelihood of prevailing on the merits he need show in order to get the injunction.'" *Id.* Alternatively, however, "[t]he importance of probability of success increases as the probability of irreparable injury diminishes, and where the latter may be characterized as simply 'possible,' the former can be decisive." *Blackwelder*, 550 F.2d at 195. When the balancing of harms is nearly equal on both sides, "[i]t is in just such a case that the probability of success begins to assume real significance, for if the factors of harm to the parties cancel each other, then 'greater significance must be placed upon the likelihood that each party will ultimately succeed on the merits." *Id.* at 195–96 n.3 (quoting *Del. River Port Auth. v. Transamerican Trailer Transp., Inc.*, 501 F.2d 917, 924 (3d Cir. 1974)).

The court also must remember that a preliminary injunction represents an extraordinary remedy and should "be granted only sparingly and in limited circumstances." *Microstrategy, Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001). Because the court must decide whether to issue a preliminary injunction on an incomplete record, the risk of mistake is greater, which requires the party seeking this remedy to clearly establish an entitlement to relief. *Hughes Network Sys. v. Interdigital Commc'ns Corp.*, 17 F.3d 691, 693 (4th Cir. 1994).

*A. Irreparable Harm to Nalco*

Nalco claims it will suffer irreparable harm if the court does not issue a preliminary injunction. The company argues Mr. McGough is competing directly against it and that he has already misappropriated confidential Nalco trade secrets, specifically "customer lists and/or customer goodwill, sales and service manuals, data (including specific customer pricing amounts and customer service repair orders), chemical product nomenclature, formulae, and/or application (including information relating to use of specific products for particular customers)." (Mem. Supp. Mot. for Prelim. Inj. 10.) **Although Nalco alleges that Mr. McGough misappropriated trade secrets and violated the non-disclosure provisions of the Field Representative Agreement in addition to the noncompetition provision, Nalco has stated that its primary concern, in terms of injury, is the noncompetition provision. Nalco stated, "[P]rimarily our concern is today, he's going back to the same customers that he was in, taking that business from Nalco, and that's what we're losing . . . . [A]nd that's what our primary concern has been in terms of the injury." (Jan 25 H'rg Tr. 78: 18-24, 79:2-4.)** Nalco claims Mr. McGough has and will continue to solicit customers away from Nalco and to ACS. Nalco argues Mr. McGough's alleged improper conduct will continue to "snowball." (Mem. Supp. Mot. for Prelim Inj. 10.) The company claims

11

"[i]t would be an insurmountable burden on Nalco to have to attempt to regain longtime customers if they have lost confidence and trust in Nalco because of Mr. McGough's inappropriate conduct." (*Id.* at 11.)

Nalco representatives testified at the hearing that it usually takes twelve to eighteen months to obtain a customer's account. (**Jan. 25 H'rg Tr. 16:6-14.**) The chemical company soliciting a coal company's account has to come into the plant and perform testing to see how the chemical company's products work in that specific coal preparation plant. Each coal preparation plant is unique. Nalco claims ACS gained an unfair advantage in the market when it hired Mr. McGough because he already knew the site-specific information for the West Virginia plants from his Nalco employment. Stephen Blubaugh, a Nalco representative, testified that Mr. McGough is doing for ACS "exactly what he was doing for Nalco." (Jan. 25 Hr'g Tr. 83:7.) **This allegation implicates the non-compete and non-disclosure provisions of the field representative agreement, as well as allegations that Mr. McGough misappropriated Nalco's trade secrets.**

Mr. Blubaugh also claims Mr. McGough deleted a number of files from his Nalco computer. He claimed Mr. McGough's computer should have contained consulting documents, service reports, productivity recaps, and audits. Mr. McGough, although he admits deleting several spreadsheets to prevent Nalco from "misusing" them, does not acknowledge deleting anything else.

Nalco claims Mr. McGough had access to documents reflecting the revenues of each of its customers within the coal mining group. Mr. Blubaugh explains access to these documents is restricted on "a need-to-know basis" and is limited to "the local sales representation or field representation, district manager, marketing, and [his] boss." (*Id.* 87:5–11.)

12

According to Mr. Blubaugh, Nalco's sales in West Virginia generated $184,868.33 per month from the beginning of 2005 to the time when Mr. McGough resigned and only $120,947.63 per month following Mr. McGough's departure. Nalco attributes this loss of business to Mr. McGough and believes he is exclusively responsible for several accounts switching from Nalco to ACS, including the accounts at Brooks Run, Terry Eagle, Fola No. 2, and Linville Coal. Larry Hyatt has taken Mr. McGough with him when making calls on prospective ACS customers. On at least one occasion, Mr. McGough told a Nalco customer that Nalco has lost all of their experienced people in West Virginia. (*Id.* 184:9–14.)

Undoubtedly, Nalco has suffered harm and will continue to suffer harm as a result of Mr. McGough's resignation. Losing an employee considered irreplaceable would detrimentally affect any company.[8] From the evidence introduced at the hearing, it is almost without question that Mr. McGough breached the Field Representative Agreement if its provisions are enforceable. Accordingly, I **FIND** Nalco will suffer irreparable harm if an injunction is not granted.

The amount of irreparable harm, however, must be tempered because evidence also was heard suggesting Nalco would have lost its former accounts to ACS even without any action by Mr. McGough. Specifically, Larry Hyatt, who grew Nalco's business in West Virginia nearly 1,000 times over from 1978 to 1998, appeared positioned to obtain Nalco's accounts on his own. Mr. Hyatt knew the people running each of the Nalco accounts in issue and had positive relationships with all of them. Also, the loss of Nalco's experienced employees in West Virginia could have contributed to its loss of business.

---

[8] According to Mr. Blubaugh, Mr. McGough is "a tough man to replace." (Jan. 26 Hr'g Tr. 141:8.)

I must balance the irreparable harm to Nalco with the harm that will occur to Mr. McGough if I issue an injunction. If the balancing of harms weighs decidedly in favor of Nalco, then the importance of the likelihood that Nalco will succeed on the merits diminishes.

*B. Harm to Mr. McGough*

Mr. McGough argues he will suffer harm if the court issues a preliminary injunction. For the court to grant the equitable relief Nalco seeks, the court must enforce the terms of the noncompetition, **and nondisclosure provisions** contained in the Field Representative Agreement against Mr. McGough. The **noncompetition provision**, examined in detail in Part II.C.4, would bar Mr. McGough from working in any similar line of business with Nalco for two years. It also would bar Mr. McGough from doing the kind of work he did for Nalco in any state he worked in the last two years, which Nalco contends consists of West Virginia, Indiana, Illinois, Kentucky, Ohio, Pennsylvania, Virginia, and Alabama. This geographic limitation, however, is applicable to Mr. McGough only if I find he was a "field representative" as that term is used in the Field Representative Agreement. If Mr. McGough was not a "field representative" immediately prior to his resignation, he is restrained from doing the kind of work he did for Nalco anywhere in the United States. Undoubtedly, Mr. McGough would have to resign his current position with ACS and find a new job. Accordingly, I **FIND** that a preliminary injunction would cause significant harm to Mr. McGough.

In balancing the harms to each party, I **FIND** the harm Mr. McGough would incur if the court issues an injunction is nearly equal to the irreparable harm Nalco would incur if the court does not issue an injunction. The balancing of hardships does not weigh decidedly in favor of either party and stands in near equipoise. *See Davis v. Crown Cent. Petroleum Corp.*, 483 F.2d 1014, 1016 (4th

14

Cir. 1973) (explaining the harm to the defendant and the plaintiff would be substantially similar).

Because the balancing of hardships does not decidedly favor Nalco, the likelihood of Nalco's

success on the merits becomes crucial.

*C. Likelihood of Success on the Merits*

*1. Law Applicable to West Virginia Uniform Trade Secrets Act Claim*

Nalco alleged that Mr. McGough violated West Virginia's Uniform Trade Secret Act

(WVUSTA) as Nalco possessed protectable trade assets that were misappropriated and/or

disclosed by Mr. McGough. These alleged protectable interests are Nalco's customer lists and

sales, pricing, and service data, the chemical programs developed for Nalco customers, and

Nalco's chemical formulae and blends used at various plants. I must first determine whether

there was a trade secret to be protected and then if I find a trade secret exists, determine

whether it was misappropriated. *Servo Corp. v. General Elec. Co.*, 393 F.2d 551, 555 (4th Cir.

1968).

> The WVUSTA defines a trade secret as:
>
> information, including, but not limited to, a formula, pattern, compilation, program, device, method, technique or process, that: (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

W. Va. Code § 47-22-1(d). In *State ex rel. Johnson v. Tsapis*, 187 W. Va. 337 (1992), the

Supreme Court of Appeals of West Virginia adopted the six-factor test set forth in Section 757

of the First Restatement of Torts to determine whether there was good cause to issue a

protective order to prevent the disclosure of the defendant's alleged trade secrets. *Id.* at 339.

In a recent unpublished opinion, the Fourth Circuit Court of Appeals expressed its belief that

15

the West Virginia Supreme Court of Appeals would apply that six-factor test to determine the existence of a trade secret. *IVS Hydro, Inc. v. Robinson*, 2004 WL 626828, at * 5 (4th Cir. Mar. 31, 2004). The *Tsapis* factors are as follows:

> (1) the extent to which the information is known outside of the [defendant]'s business;
> (2) the extent to which it is known by employees and others involved in the [defendant]'s business;
> (3) the extent of the measures taken by the [defendant] to guard the secrecy of the information;
> (4) the value of the information to the [defendant] and competitors;
> (5) the amount of effort or money expended by the [defendant] in developing the information; and
> (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

187 W. Va. at 339. Other courts have applied similar multi-factor tests to determine whether trade secrets exist. *See, e.g., Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 722 (7th Cir. 2003); *Harvey Barnett, Inc. v. Shidler*, 338 F.3d 1125, 1129 (10th Cir. 2003). Under these tests, the absence of evidence as to any one factor does not necessarily preclude a finding that a trade secret exists. *Learning Curve Toys*, 342 F.3d at 722. The factors should be viewed as instructive guidelines, weighed together in making that determination. *Id.*

### A) Customer Lists

I first examine the merits of the trade secrets claim as to the customer lists. The names of the plants are commonly known within the industry. There are approximately sixty plants. Mr. McGough testified that, "the accounts are pretty much common knowledge in the coal fields who has the business." (Jan. 26 H'rg Tr. 81:7-8.) He further stated that, "there's a lot of people that would know those plants ... what company owns them." (Jan. 26 H'rg Tr. 82:3-7.) Weighing all the factors it is unlikely I would find the customer lists to be a trade secret.

The names of the customers and which company has which account is commonly known in the industry, and would have little value to competitors. Furthermore, Mr. McGough testified that he does not have a customer list, though he has seen various lists over the years.

### B) Customer Data

I next examine Nalco's claim that the customer data including sales and service data are protectable trade secrets. At the preliminary injunction hearing Nalco explained that this information included data on the quality of coal customers needed, the type of equipment used, sales and service data, including which Nalco customers were profitable and where Nalco might invest additional resources. (Jan. 25 H'rg Tr: 18, 73, 74.) This information, Nalco contends, can only be learned by working with a customer over a period of time. It takes Nalco twelve to eighteen months to develop a chemical program for a customer. (Jan. 25 H'rg Tr: 16, 76-77.)

Nalco argues that the information specific to each customer is not known outside Nalco, and Nalco limits access to this information to those employees that have a need to know. Nalco guarded the secrecy of the information by requiring employees to sign agreements, such as the one at issue in this case, containing confidentiality and non-disclosure clauses, password protected the information within Nalco's computer system, and did not disclose details of the programs to the companies. Nalco further states that the information has great economic value to them. Developing each customer plan takes considerable time and effort – Nalco estimated that the process takes about twelve to eighteen months. Because this information is gathered after many months of working with a customer, Nalco argues that it is not easily duplicated or acquired by a competitor.

17

Regardless of whether or not this information may be considered **a trade secret there is no evidence on the record that Mr. McGough disclosed or misappropriated this information. Therefore I am unlikely to find that this information was misappropriated by Mr. McGough.**

### C) Chemical Formulae and Blends

**These formulas and blends whether or not trade secrets have not been shared by Mr. McGough. Mr. McGough testified that he has not disclosed Nalco's blends to anyone, and he has not traded on or used the blends or formulas in any commercial way. No evidence to the contrary was proffered at the two-day preliminary injunction hearing. Thus I am unlikely to find a misappropriation of trade secrets as to Nalco's blends and formulas.**

**I FIND that Nalco would likely fail on the merits of its WVUSTA claims.**

### 2. The Applicable Law as to the Contract Claims

The likelihood of Nalco prevailing on the merits depends on whether the court will enforce the provisions of the Field Representative Agreement. **These provisions include the non-compete clause, the non-disclosure clause, and the trade secrets clause.** To analyze whether those provisions are enforceable, the court first must determine which state's law to apply. The court must employ West Virginia's conflicts rules because the case arises through the court's diversity jurisdiction and this court sits in West Virginia. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).

When considering conflicts questions in contract cases, the West Virginia Supreme Court of Appeals has recognized the paucity of West Virginia law in this area. *Gen. Elec. Co. v. Keyser*, 275 S.E.2d 289, 292 (W. Va. 1981). The court describes this area of law as "often confusing." *Id.* In an effort to alleviate the confusion, I will break down my conflicts inquiry into two distinct parts.

18

Separating the inquiry is necessary because two different choice of law rules must be applied to this case. *See Pen Coal Corp. v. William H. McGee and Co.*, 903 F. Supp. 980, 984 (S.D. W. Va. 1995) (explaining the West Virginia Supreme Court of Appeals has preferred to resolve conflicts disputes using choice of law rules rather than by "adopted methods of analysis"); *see also Paul v. Nat'l Life*, 352 S.E.2d 550, 554 (W. Va. 1986) ("The lesson of history is that methods of analysis . . . produce protracted litigation and voluminous, inscrutable appellate opinions, while rules get cases settled quickly and cheaply.").

The court first will decide which state's law to apply when examining the enforceability of the contract as a whole. Key to this issue will be whether the formal requisites of a contract to create a valid contract at law are met. Then, the court will determine which state's law to apply when examining the performance that is in issue—specifically, the enforceability of the contract's noncompetition **and nondisclosure** provisions in equity. Applying different states' law to different issues of contract enforceability in the same case is not uncommon. *See Tow v. Miners Mem'l Hosp. Ass'n*, 305 F.2d 73, 75 (4th Cir. 1962) (applying New York law to the making of the contract and West Virginia law to the performance of the contract under West Virginia's conflicts rules); *see also Boyd v. Pancake Realty Co.*, 46 S.E.2d 633, 636–37 (W. Va. 1948) (applying West Virginia law to the making of the contract and Ohio law to the performance of the contract under West Virginia's conflicts rules). Alabama law must apply to the events that occurred in 1978—the formation of the contract—and West Virginia's law must apply to the events occurring now—Mr. McGough's alleged breach of the noncompetition **and non-disclosure** provisions and Nalco's attempt to specifically enforce the contract in equity.

*a. Alabama Law Governs Whether the **Whole** Contract Is Valid at Law*

West Virginia law provides that "the law of the state in which a contract is made and to be performed governs the construction of a contract when it is involved in litigation." *Gen. Elec. Co.*, 275 S.E.2d at 292 (quoting *Mich. Nat'l Bank v. Mattingly*, 212 S.E.2d 754, 755 (W. Va. 1975)); *see also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Coe*, 313 F. Supp. 2d 603, 609 (S.D. W. Va. 2004) (examining parties' contractual choice of law provision under West Virginia's conflicts rules). This rule is known as *lex loci delicti*, which "has long been the cornerstone" of West Virginia's conflicts doctrines. *Paul*, 352 S.E.2d at 555. The West Virginia Supreme Court of Appeals explains that the "consistency, predictability, and ease of application provided by the traditional doctrine are not to be discarded lightly." *Id.* Using this traditional rule, West Virginia courts, when examining the making of a contract, apply the law of the state where the last event necessary to make a contract binding occurs. *Tow*, 305 F.2d at 75; *see also Galloway v. Standard Fire Ins. Co.*, 31 S.E. 969, 970 (W. Va. 1898) (explaining how to determine the place where a contract is made).

Applying the rule of *lex loci delecti* to this case reveals Alabama law governs the validity of the contract at law. Although a Nalco representative first signed the contract in Illinois, it then was mailed to Alabama, where Mr. McGough signed it. The contract could not be binding until Mr. McGough signed it in Alabama. The contract did not state where it was to be performed, and arguably could have been performed in the entire country because of the wide geographic scope of the noncompetition provisions. **The nondisclosure provisions are similarly broad in scope.** According to the testimony at the hearing, however, Mr. McGough initially was hired to serve exclusively as a sales representative in the Alabama coalfields. Therefore, the contract, at least initially, was to be performed in Alabama. Accordingly, Alabama law governs the making of the contract under the traditional rule of *lex loci delecti*.

20

In some contracts cases, courts applying West Virginia's conflicts rules also have looked to the *Restatement (Second) of Conflicts* for guidance. *Ferrell v. Grange Ins.*, 354 F. Supp. 2d 675, 678 (S.D. W. Va. 2005); *Martin v. John Hancock Mut. Life Ins. Co.*, 56 F. Supp. 2d 670, 672 (S.D. W. Va. 1999). Reflecting the modern trend away from the traditional rule of *lex loci delicti*, the *Restatement*'s choice of law rule for the validity of contracts embodies the most significant relationship test. Section 188 states that when a contract does not contain an effective choice of law provision, it should be examined under the local law of the state with the most significant relationship to the transaction and the parties. Even though the West Virginia Supreme Court of Appeals has not expressly adopted section 188 as it has other sections, *see New v. Tac & C Energy, Inc.*, 355 S.E.2d 629, 631 (W. Va. 1987) (adopting section 196 explicitly), the court has relied on section 188's most significant relationship approach on occasion, especially when the traditional doctrine of *lex loci delecti* proved unhelpful. *City of Bluefield v. Autotrol Corp.*, 723 F. Supp. 362, 364 (S.D. W. Va. 1989). The *Restatement* sets forth the following factors to determine the state with the most significant relationship to the issue: the place of contracting; the place of negotiation; the place of performance; the location of the subject matter of the contract; and the domicile, residence, place of incorporation, and place of business of the parties.[9] *Restatement (Second) of Conflicts* § 188(2) (1971).

---

[9] Other factors to consider when applying the most significant relationship test include: (1) the needs of the interstate and international systems; (2) the relevant policies of the forum; (3) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue; (4) the protection of justified expectations; (5) the basic policies underlying the particular field of law; (6) certainty, predictability, and uniformity of result; and (7) ease in the determination and application of the law to be applied. *Restatement (Second) of Conflicts* § 6; *Pen Coal Corp. v. William H. McGee and Co.*, 903 F. Supp. 980, 986 (S.D. W. Va. 1995).

When applying the most significant relationship test, the court must first isolate the particular issue in dispute. The court then must determine which state has the most significant relationship with the particular issue. This case presents two different particular issues: 1) the validity of the contract at law when it was entered into in 1978 and 2) the enforceability of the contract in equity in 2005. As stated above, Alabama law controls the first issue according to the traditional doctrine of *lex loci delecti*. Even if the court applies the most significant relationship test to this issue, Alabama law still controls because Alabama had the most significant relationship with the formation of this contract. The place of contracting and the place of performance, at least as contemplated initially, were Alabama. Mr. McGough's residence at the time was Alabama and although Nalco was a "resident" of Delaware and Illinois, it also conducted business in Alabama. The place of negotiation is in dispute: Nalco contends the contract was discussed in Illinois, but Mr. McGough argues that he first learned of it when he received it in Alabama. Despite this dispute, applying the most significant relationship test at the time of contracting clearly reveals Alabama law governs. Therefore, regardless of whether the court employs the traditional rule of *lex loci delecti* or the modern most significant relationship test, Alabama law governs the first issue—whether the formal requisites of a contract are met to make the contract valid at law.

*b. West Virginia Law Governs the Enforceability of the Contract in Equity*

Alternatively, applying Alabama law to the second issue—the enforceability of the noncompetition **and nondisclosure** provisions in equity nearly thirty years after the parties signed the contract—does not make sense to me. West Virginia has the most significant relationship to this particular issue. West Virginia, unlike Alabama, has a substantial stake in the pending litigation. Nalco seeks to enjoin Mr. McGough from working with its former customers in West Virginia.

22

**Nalco further seeks to enjoin Mr. McGough from disclosing customer lists, and other trade secrets. Mr. McGough is working in West Virginia, the alleged list of customers is a list of West Virginia companies. Nalco is concerned Mr. McGough will disclose confidential information and trade secrets to former and potential customers. As stated above these customers are in West Virginia.** Mr. McGough is a resident of West Virginia and has not worked in Alabama since the early 1990s. Of the positions Mr. McGough had while working for Nalco, he had more responsibility in West Virginia than Alabama, where he was never more than a sales representative. Undoubtedly, West Virginia has a more significant relationship with respect to the enforceability of the noncompetition **and non-disclosure** provisions than does Alabama.

The most significant relationship test is applicable to this issue because West Virginia explicitly has adopted *Restatement (Second) of Conflicts* section 196 to govern contracts for the rendition of services. *New*, 355 S.E.2d at 631 ("We find this to be a fair and equitable rule and adopt it in this jurisdiction."). This section explains that the "validity of a contract for the rendition of services and the rights created thereby are determined . . . by the local law of the state where the contract requires that the services, or a major portion of the services, be rendered, *unless*, with respect to the *particular issue*, some other state has a more significant relationship . . . to the transaction and the parties." *Id.* § 196 (emphasis added). The "comments & illustrations" to this section of the *Restatement* explain that the section's rule governs questions such as "the duration of the contract, the circumstances under which either party may terminate the contract, *the validity of a clause forbidding the employee from entering a business competitive with that of the employer for a stated period after the termination of the employment*, and whether the contract of employment must be in writing to be binding." *Id.* § 196 cmt. a (emphasis added). Even though Mr. McGough's

contract is not an actual employment contract, it deals with rendering, or as better stated, the prohibition of rendering, services. **This prohibition on rendering services encompasses both the covenant not to compete and the non-disclosure covenants.** I **FIND** the West Virginia Supreme Court of Appeals would apply the rule set forth in *Restatement* section 196 to the facts of this case to determine whether the noncompetition provision can be enforced in equity. **I further FIND that the West Virginia Supreme Court of Appeals would apply this most significant relationship test to determine whether the nondisclosure and trade secret provisions can be enforced in equity.** This rule results in the application of West Virginia law.

Accordingly, I will apply Alabama law to determine the validity of the contract at law when it was made in 1978, *infra* Part II.C.2, and West Virginia law to determine the enforceability of the noncompetition, **nondisclosure** provisions in 2005, *infra* Part II.C.3–4. 2.

*2. Likelihood the Contract Is Valid At Law*

Numerous courts have examined the enforceability of noncompetition agreements signed after the commencement of at-will employment. As the following pages explain in detail, however, few of them agree on the proper analysis to use and many disguise the true reasons for their decisions by basing decisions exclusively on formal contract requirements.

**The cases discussing the validity of nondisclosure or confidentiality provisions are far fewer in number and when addressed the analysis is often done in conjunction with the analysis of the validity of the noncompetition provision. Nondisclosure provisions and noncompetition provisions are both restrictive covenants and their enforceability is based on the reasonableness of the restrictions based on the facts and circumstances of the case. Thus**

24

**though the majority of cases address only covenants not to compete, the restrictive covenant of nondisclosure is analogous and should be analyzed under the same standard.**

*a. Formal Contract Requirements*

To determine whether to enforce the contract, I first must ensure that the formal requirements of offer, acceptance, and consideration are met. *See Ex parte Holland Mfg. Co.*, 689 So. 2d 65, 66 (Ala. 1996) ("No contract can be formed without an offer, acceptance, consideration, and mutual assent to the terms essential to the contract."). Even though Nalco is seeking an equitable remedy, equity generally requires a contract to be valid at law before being enforceable in equity. 25 Richard A. Lord, *Williston on Contracts* § 67:2 (4th ed. 1992). The only requirement at issue in this contract is the element of consideration, which is disputed because the contract was signed ten days following the beginning of Mr. McGough's at-will employment. Consideration must be present when the contract is made. *Fant v. Champion Aviation, Inc.*, 689 So. 2d 32, 37 (Ala. 1997). Adequate consideration exists for a valid contract as long as valuable consideration moves from one side to the other or each party makes binding promises to the other party. *Marcrum v. Embry*, 282 So. 2d 49, 51 (Ala. 1973). Was Mr. McGough's contract supported by consideration or did it fail to become a valid contract at law because Nalco's obligations were illusory?

In Alabama, the contract in issue would be upheld as supported by consideration. In *Daughtry v. Capital Gas Co.*, 229 So. 2d 480 (Ala. 1969), the Alabama Supreme Court held that a noncompetition provision does not have to be signed at the time employment commences to be enforceable. *See Affiliated Paper Cos. v. Hughes*, 667 F. Supp. 1436, 1447 (N.D. Ala. 1987) (stating *Daughtry* is "clear authority" for this proposition). Capital Gas Company, a seller of liquified petroleum gas, orally hired Eric Daughtry on January 15, 1966, to be the branch manager for its

25

Tuskegee, Alabama office. *Daughtry*, 229 So. 2d at 481. Six months later, on June 1, Mr. Daughtry signed a written employment contract containing a noncompetition covenant. *Id.* Mr. Daughtry then resigned in February 1967 and began working for a competitor in August of that year. *Id.* at 482. When Capital Gas Company attempted to enforce the contract, Mr. Daughtry contended the contract was unenforceable for lack of consideration. *Id.* The court rejected this argument and reasoned that Capital Gas Company's continued employment of Mr. Daughtry after he signed the contract—from June 1, 1966 to February 1, 1967—constituted valid consideration. *Id.* at 483. In addition, the court pointed to "the apparent willingness of the company to continue to employ him in the future" and a contract provision guaranteeing at least a three-month minimum term of employment as further evidence of valid consideration. *Id.* Even though Mr. McGough's contract is not a written employment agreement and does not contain a term guaranteeing employment for any amount of time, the Alabama Supreme Court likely would find Mr. McGough's continued employment for Nalco to constitute valid consideration.

Like Alabama, courts in many other states would find Mr. McGough's continued employment to be valid consideration. On the other hand, many states would declare the contract unenforceable for lack of valid consideration. The wide divergence on a basic matter of law such as this is cause for concern and requires an analysis of these decisions' foundations.

Most courts finding valid consideration in this situation agree with the Alabama Supreme Court that continued employment, beyond the day that the covenant is signed, provides valid consideration. *Olin Water Servs. v. Midland Research Labs., Inc.*, 596 F. Supp. 412, 415 (E.D. Ark. 1984); *Clark v. Liberty Nat'l Life Mut. Ins. Co.*, 592 So. 2d 564, 567 (Ala. 1992); *Copeco, Inc. v. Caley*, 632 N.E.2d 1299, 1301 (Ohio Ct. App. 1992). In these cases, the employer's decision not

to fire an at-will employee is consideration in exchange for the covenant. Tracy L. Staidl, *The Enforceability of Noncompetition Agreements When Employment Is At Will: Reformulating the Analysis*, 2 Emp. Rts. & Emp. Pol'y J. 95, 104 (1998). The promise itself to employ is illusory but when the promise to employ is supported by performance, such as the payment of salary, as long as the employment continues, consideration exists for the covenant. Kathryn J. Yates, *Note: Consideration for Employee Noncompetition Covenants in Employments At Will*, 54 Fordham L. Rev. 1123, 1129 (1986).

Some courts, however, require the employment to continue for a "substantial" or "reasonable" period after the employee signs the covenant to become valid, or adequate, consideration. *Zellner v. Conrad*, 589 N.Y.S.2d 903, 907 (N.Y. App. Div. 1992); *see Curtis 1000, Inc. v. Seuss*, 24 F.3d 941, 945–46 (7th Cir. 1994) (explaining Illinois law requires continued employment for a "substantial period"); *Cent. Adjustment Bureau, Inc. v. Ingram*, 678 S.W.2d 28, 35 (Tenn. 1984) (asserting continued employment for a short time could be insufficient consideration). These courts reason that the employee's continued employment for a significant amount of time is evidence that the employer's forbearance from firing the employee was real, not illusory, at the time the covenant was signed. Stairdl, *supra*, at 104–06.

Other courts find continued employment itself is not valid consideration and require the employer to promise to bestow additional benefits upon the employee in exchange for signing the agreement. *Rogers v. Runfola & Assocs., Inc.*, 565 N.E.2d 540, 542 (Ohio 1991) (finding valid consideration when employer promised not to terminate employee except for specified reasons in exchange for covenant); *Mail-Well Envelope Co. v. Saley*, 497 P.2d 364, 366–67 (Or. 1972) (finding valid consideration when employer promised to increase employee's monthly salary in exchange

for covenant). Even though some courts focus on the mere promise to bestow additional benefits, some courts require the employer actually to confer the additional benefits on the employee in exchange for the covenant. *Sanborn Mfg. Co. v. Currie*, 500 N.W.2d 161, 164 (Minn. Ct. App. 1993); *Insulation Corp. of Am. v. Brobston*, 667 A.2d 729, 733 (Pa. Super. Ct. 1995); *Wolf v. Colonial Life and Accident Ins. Co.*, 420 S.E.2d 217, 222 (S.C. Ct. App. 1992). Additional benefits that have constituted valid consideration include additional training, receipt of confidential information, a change in pay or job title, or a notice of termination provision. Yates, *supra*, at 1133–34 & nn.48–53.

Although these courts find valid consideration in different ways, the other major line of cases never finds continued employment, even if continued for a significant period of time, to be valid consideration. The West Virginia Supreme Court of Appeals, for example, holds that when a noncompetition covenant is entered into after the commencement of at-will employment, new consideration, apart from continued employment, must support the covenant. *Pemco Corp. v. Rose*, 257 S.E.2d 885, 889 (W. Va. 1979). If the later-signed agreement fails to alter any benefits, conditions, or terms of employment, and merely imposes limitations on the employee, then the agreement is void for lack of consideration. *Envtl. Prods. Co. v. Duncan*, 285 S.E.2d 889, 891 (W. Va. 1981). Courts following this reasoning contend that any promise to continue employing, or in other words, the act of forbearing from firing the employee, is meaningless in an at-will employment setting. As the North Carolina Supreme Court eloquently explains: "A consideration cannot be constituted out of something that is given and taken in the same breath—of an employment which need not last longer than the ink is dry upon the signature of the employee, and where the performance of the promise is under the definite threat of discharge." *Kadis v. Britt*, 29 S.E.2d 543,

548 (N.C. 1944). Because the employer is getting something—a promise from the employee not to compete **or a similar promise not to disclose information**—at the expense of giving up nothing, courts also focus on the lack of mutuality inherent in these agreements. *See* Jordan Liebman & Richard Nathan, *The Enforceability of Post-Employment Noncompetition Agreements Formed After At-Will Employment Has Commenced: The "Afterthought" Agreement*, 60 S. Cal. L. Rev. 1465, 1511 (1987). Some courts finding valid consideration, however, contend that although mutuality is lacking at the agreement's inception, this defect can be cured following an amount of performance. *See id.* (stating the highest courts of New Hampshire, Iowa, Mississippi, along with lower courts in Arizona and Arkansas, follow this reasoning).

These widely divergent decisions reflect the differences of opinion about whether consideration exists in this situation. Under Alabama law, which I must apply to this issue of the case, valid consideration existed for Mr. McGough's noncompetition agreement **and other restrictive covenants, including the nondisclosure provision,** based on his continued employment with Nalco. Finding valid consideration, however, does not necessarily make the contract enforceable. Because Nalco seeks an equitable remedy, I must look beyond formal contract principles to determine if I am likely to enforce this agreement in equity. *See* Yates, *supra*, at 1126 ("Courts in [cases involving equitable remedies] demand more than the minimum requisites of offer, acceptance, and consideration needed to enforce a contract at law.").

I first will explain my view that previous judicial decisions finding these types of agreements enforceable, or unenforceable, because of consideration or lack thereof, are misguided. The following section criticizes each of the approaches courts have taken on the consideration issue. By resting decisions solely on consideration grounds, courts actually disguise the true reasons for their

29

decisions, which instead are grounded in equitable doctrines of fairness. *See id.* at 1127 ("[T]hey analyze the issue under the guise of consideration."). I then will discuss enforcement of this agreement in equity.

*b. Analysis Guided By Consideration Is Misguided*

Courts finding valid consideration in continued employment, regardless of the length of time, generally state the proposition that "every day is a new day for both employer and employee" during a term of at-will employment. *Copeco*, 632 N.E.2d at 1301. Every day the employment continues, the employer makes a decision to retain the employee in exchange for the employee's services, or so goes the argument. This proposition, however, is true not only after an at-will employee signs a noncompetition agreement, *but also before.*

For example, assume Virtucon hires Frau Farbissina on Monday as an at-will employee under an oral employment agreement. On Wednesday, Virtucon makes Frau sign a noncompetition covenant. According to the courts' proposition, as soon as the agreement is signed, as long as Virtucon refrains from terminating Frau, valid consideration exists. These courts, however, overlook the fact that Virtucon's position in its relationship with Frau does not change at all when Frau signs the covenant. On Thursday, even though Frau now has a covenant not to compete, Virtucon could terminate her employment, just as it could have done on Tuesday. Frau's position, on the other hand, changes dramatically because she cannot compete in the same line of business

with Virtucon.[10] No "corresponding restriction" applies to the employer's power to discharge the employee, which makes the contract illusory. Staidl, *supra*, at 105.

The approach taken by courts requiring the continued employment to last for a "substantial" or "reasonable" term following the signing of the covenant also is misplaced. Because this approach requires courts to review the length of time employment continues, it requires a retrospective analysis. At the time a contract is entered into, consideration either exists or it does not. Having to look back to the time when the contract is formed at some uncertain point in the future breeds unpredictability. *Id.* at 106. Both the employer and the employee should be able to determine the enforceability of a noncompetition covenant when signed, which is impossible under this approach. *Id.*

Recent developments in the law affecting the status of at-will employment also weigh against finding continued employment, by itself, to be valid consideration. Many jurisdictions are limiting an at-will employer's ability to terminate at-will employees for no reason. Yates, *supra*, at 1123 n.1, 1132. In employment contracts for a term, continued employment is a pre-existing duty and certainly would be invalid consideration for a later-signed noncompetition **or other restrictive** agreement. *Id.* at 1132. "As the doctrine of employment at will erodes, more courts may adopt the

---

[10]    Not being able to compete in the same line of business with Virtucon admittedly would be a considerable restriction on Frau. As Number Two explains:

> Over the last thirty years, Virtucon has grown by leaps and bounds. About fifteen years ago, we changed from volatile chemicals to the communication industry. We own cable companies in thirty-eight states. In addition to our cable holdings, we own a steel mill in Cleveland, shipping in Texas, oil refineries in Seattle, and a factory in Chicago that makes miniature models of factories.

*Austin Powers: International Man of Mystery* (1997).

view that because the employer is not really free to terminate employment at any time, continued employment is merely a pre-existing duty in at-will employment as well." *Id.*; *see also* Liebman & Nathan, *supra*, at 1473–74 ("[T]he power to discharge employees at-will has become significantly constrained in recent years by doctrines such as the public policy exception to at-will employment, implied contracts of employment, and implied covenants of good faith and fair dealing."). The effectiveness of the approach taken by courts finding valid consideration in continued employment, even for a lengthy time, will continue to dampen as courts recognize more "contractual" rights in at-will employment relationships.

The approach finding valid consideration in the employer's promise to confer additional benefits or the actual conferring of additional benefits on an employee in exchange for signing the noncompetition **or other restrictive** covenant also is misguided. These courts tend to examine the additional benefits promised or conferred to determine if they are substantial enough to warrant an exchange for a signed covenant. This process, however, involves weighing the adequacy of consideration, which traditional contract law warrants against. Unless the additional benefits are set forth in a written contract or as a term of the noncompetition **or nondisclosure** agreement, which rarely is the case, an at-will employer easily could take back any promised or conferred benefits, rendering the benefits illusory. Staidl, *supra*, at 107. Because a court's subjective determination of the "sufficiency of the benefits" conferred on the employee "may differ from that of the parties to the agreement, this approach also breeds uncertainty regarding the enforceability of noncompetition agreements at the time of their signing." *Id.* at 108. In addition to a court's problem in determining if the benefits are substantial enough to constitute consideration, a court also could

have problems determining whether the benefit was conferred in exchange for the covenant. *Id.* at 109.

Although reasons exist for questioning each of the approaches courts take to find valid consideration in this situation, the approach courts take to find covenants unenforceable for lack of consideration is not much better. These courts focus on the requirement that in order for something to constitute consideration, it must be bargained and exchanged for the promise not to compete. Yates, *supra*, at 1136. Later promotions and compensation increases are not bargained for at the time the noncompetition agreement is signed and thus cannot be consideration for that agreement.[11] *Ingram*, 678 S.W.2d at 38–39 (Brock, J., dissenting). At least one judge explains that in a case where covenants not to compete were given to employees shortly after the start of working, the covenants "were no longer the subject of free bargaining" and they were "imposed upon the employees." *Id.* at 38. The same judge writes: "Even if [the employee] is notified of the restrictive covenant on the first day of his new employment, he has foreclosed his other options at that point and has little choice but to sign." *Id.* at 39. In other words, once the employee starts working, especially in an at-will context, his bargaining power is diminished considerably more than before employment started. Yates, *supra*, at 1137. "This, however, is not an issue of consideration; it is one of fairness." *Id.*

Also muddying the consideration analysis is the backdrop that some courts first require a finding that the noncompetition agreement is not ancillary to the original employment agreement

---

[11]     Obviously, no consideration problem would exist if an employer goes to an employee and says, "if you sign this noncompetition agreement, I'll give you ____." Regardless, of what is inserted in the blank, if the agreement is generated through an actual bargained-for exchange, formal contract requirements are satisfied.

before searching for independent consideration. *Id.* at 1128–29. Generally, a covenant signed prior to, contemporaneous with, or any time during employment is ancillary to employment. *Id.* at 1128. If ancillary to employment, the covenant can be supported by the same consideration supporting the employment contract. *Seaboard Indus., Inc. v. Blair*, 178 S.E.2d 781, 787 (N.C. 1971). Some courts, however, completely dispense with the need to find the covenant "ancillary" to employment and delve straight into the consideration analysis. *Criss v. Davis, Presser & Lafaye*, 494 So. 2d 525, 527 (Fla. Dist. Ct. App. 1986); *Corroon & Black of Illinois, Inc. v. Magner*, 494 N.E.2d 785, 791–92 (Ill. Ct. App. 1986); *Jostens, Inc. v. Nat'l Comp. Sys., Inc.*, 318 N.W.2d 691, 703–04 (Minn. 1982); Staidl, *supra*, at 103–04. The Alabama Supreme Court falls in line with these cases and does not require an initial finding that a covenant is ancillary to employment. *Clark*, 592 So. 2d at 567.

Resting a decision about the enforceability of a noncompetition or **nondisclosure** agreement entered into after the start of at-will employment exclusively on consideration grounds obviously is problematic, regardless of the approach taken. The reasoning behind each of these approaches is subject to legitimate criticism and in reality, serves as a smokescreen to cover the real grounds for decisions made on equitable grounds. Even though I **FIND** that the formal requirements of a contract are met according to Alabama law, I now must determine whether I am likely to enforce this agreement in equity.

*3. Likelihood the Contract's Provisions Are Enforceable in Equity*

Enforcing noncompetition **and nondisclosure** covenants presents an unusual scenario in contract law where the primary remedy for breach of contract is not an action for damages. Because damages alone generally would present an incomplete remedy in these cases, equitable remedies in

the form of injunctions are sought to specifically enforce the covenants. *See* Lord, *supra*, § 67:8 (explaining equitable remedies for breach of contract generally available only when court first determines remedies at law would be incomplete or inadequate to accomplish justice).

Even though a contract valid at law is also enforceable in equity, "equity reserves a discretion in granting its relief." *Id.* § 67:16. The granting of equitable remedies is within the sound discretion of the trial court "with regard to facts and circumstances of the particular case." *Gray v. Marino*, 76 S.E.2d 585, 593 (W. Va. 1953). Whenever a legally valid contract is grossly unfair, equity will not enforce it. Lord, *supra*, § 67:17.

Free-standing noncompetition covenants not tied explicitly to a particular job trouble me. In this case, Nalco hired Mr. McGough as a sales representative in 1978 to work in Alabama. During a time period spanning nearly three decades, Mr. McGough climbed the corporate ladder by becoming a sales representative in a larger area, an account manager, a manager of technical services, and eventually an industry technical consultant. With each new job came additional duties, benefits, responsibilities, **and access to more and different information**. At no point during his Nalco employment, however, did Nalco ask or require Mr. McGough to sign a new noncompetition covenant **or new nondisclosure agreement**. Instead, Nalco has rested for nearly thirty years on the 1978 Field Representative Agreement to prevent Mr. McGough's competition with Nalco if he and the company ever parted ways.

Although the agreement does not contain any terms about serving as a sales representative in the Alabama coalfields, the agreement obviously was tied to Mr. McGough's initial position at Nalco. No provision of the agreement suggests it will bind Mr. McGough as he changes jobs within the company with consequent changes in his place of work, his duties, and his compensation. Little

35

effort would have been needed to negotiate and require Mr. McGough either to sign a new and defined noncompetition covenant or to draft a written employment contract incorporating the 1978 agreement. These steps were not taken and I now am left to determine the equitable enforceability of this free-floating covenant.

This covenant **and the nondisclosure covenants are** free floating because **they** followed Mr. McGough regardless of his position in the company. Reviewing Mr. McGough's employment history with Nalco reveals that a new at-will employment contract was formed every time Nalco changed Mr. McGough's position, benefits, or responsibilities. According to Nalco, however, the covenant remained effective as a backdrop contractual requirement attached to all his jobs with the company. Having entry-level, at-will employees sign noncompetition covenants **and other restrictive covenants** intended to freely float throughout the history of their relationship with a company regardless of new positions, benefits, and responsibilities, is grossly **unfair.**

For example, assume Bushwood Country Club hires Carl Spackler as the assistant greenskeeper. Bushwood's president, the Honorable Judge Elihu Smails, orally hires Spackler to work for $100 a week. A few days later, Judge Smails delivers a contract to Spackler containing a covenant not to compete or disclose trade secrets. Judge Smails and members of the Bushwood establishment would hate to see other golf-related businesses obtain access to Bushwood's techniques for growing grass. After watching Spackler's uncanny ability to grow grass and keep gophers off the course for nearly a decade, Judge Smails decides to promote him to head greenskeeper and increases his salary to $200 per week. As head greenskeeper, Spackler is more independent and may implement the techniques he feels will improve Bushwood's grass-growing abilities. Because each hole on the course gets a varied amount of sunlight, different types of

grasses work better on some holes than others, but Judge Smails trusts Spackler to find the right grass for each one.[12] Spackler's creative ingenuity becomes recognized and he is appointed to replace Mr. Porterhouse as the clubhouse manager, a job that pays $300 per week and carries enhanced responsibilities, such as shining the Judge's shoes frequently. Finally, once some of Bushwood's progressive members force Judge Smails to retire, they appoint Spackler to become president. Spackler, after serving a few years, leaves Bushwood and goes to work for Czervik Country Club, Bushwood's chief competitor. Bushwood, claiming Spackler is bound by the noncompetition agreement **and nondisclosure agreement** he signed thirty years earlier as an entry-level employee, brings suit against Spackler.

As is the case with Mr. McGough, the noncompetition **and nondisclosure** agreements Spackler signed related solely to his first position with the company. **They**, like the agreement in this case, contained no parameters, which allowed **them** to float freely over Spackler's head while he ascended the corporate ladder. Enforceability of such provisions in equity must be determined at the time the relief is sought. For this reason, I cannot say such free-floating agreements are always grossly unfair.[13] I can, however, say that equity prevents enforcement of these agreements when an employee's position has changed as dramatically as Mr. McGough's did from the time he signed the agreement as a twenty-four year old, entry-level employee to the time he resigned as one of the top men in his field.

---

[12]    Spackler's favorite grass is a hybrid, "a cross, ah, of Kentucky Bluegrass, Featherbed Bent, and Northern California Sensemilia." *Caddyshack* (1980). I credit my esteemed law clerk, Matt Gatewood, for the *Austin Powers* and *Caddyshack* references. They are apt and perhaps will serve to stir the likely somnolent readers of this lengthy opinion.

[13]    *But see* Staidl, *supra*, at 118 (arguing these agreements should be unenforceable as a matter of law).

Also weighing against the enforcement of this agreement in equity is the disputed factual issue of whether Mr. McGough left his employment with Nalco in 1989 for approximately two weeks to work for Custom Creations, a van-customizing company owned by a friend. Mr. McGough claims he assumed the title of marketing manager for Custom Creations. (Jan. 26 Hr'g Tr. 20:6–7.) He claims he recommended that Nalco fill his vacancy with one of Mr. McGough's customers, Mike Wendell. (*Id.* 20:9–11.) Allegedly, Mr. McGough worked two weeks for Custom Creations and received one paycheck, but then "started realizing [he] might have made a mistake." (*Id.* 20:12–16.) According to Mr. McGough, he "wasn't sure that this company was financially stable." (*Id.* 20:17.) Throughout the time he allegedly worked for Custom Creations, Mr. McGough claims he stayed in contact with Larry Hyatt, who was a Nalco district manager in West Virginia. (*Id.* 20:18–19.) Mr. McGough contends Mr. Hyatt contacted him to see if he was interested in returning to work for Nalco, but in West Virginia instead of Alabama. (*Id.* 21:7–10.) Mr. McGough testified that he and his wife flew to Charleston courtesy of Nalco and spent four or five days looking at houses, visiting schools, and traveling around the local coalfields before accepting Mr. Hyatt's offer. (*Id.* 21:20–25.) Mr. Hyatt corroborated Mr. McGough's testimony at the hearing. If Mr. McGough did quit his Nalco employment, then the noncompetition covenant signed in 1978 began to run in 1989 and expired in 1991.

Nalco, however, introduced evidence at the hearing suggesting that Mr. McGough has been a Nalco employee since his initial hiring in 1978. For example, Mr. McGough's 401(k) plan vested prior to his alleged departure in 1989 and he admits he did not have to revest once he returned. (*Id.* 100:12.) Also, when Mr. McGough resigned, his pension benefit traced back to 1978, not to 1989. (*Id.* 100:17.) According to Mr. McGough, a "patch" was put together so the pension plan would

relate back to 1978. (*See id.* 100:20–21 ("I'm sure I was told that they had patched my time through on the retirement.").) Because of this "patch," Mr. McGough agreed at the hearing that Nalco treated him as if he had worked at Nalco continuously since 1978. (*Id.* 102:2.) As evidence that his employment ended and then resumed, however, Mr. McGough claims Nalco took his company car in 1989 when he allegedly left. (*Id.* 150:11–12.) As explained in Part I, I cannot find based on the evidence heard at the hearing that Mr. McGough resigned his employment with Nalco in 1989. The possibility he did, however, increases the likelihood that I will not enforce the noncompetition agreement.

I **FIND** the likelihood of Nalco's success on the merits to be low because I am most unlikely to enforce the 1978 Field Representative Agreement because equity prevents it. Even if I was to find the contract enforceable in equity, however, I would find the likelihood of success on the merits still is low because of the unreasonable terms of the noncompetition covenant.

*4. Likelihood the Terms of the Noncompetition **and Nondisclosure** Covenants Are Unreasonable*

The West Virginia Supreme Court of Appeals has adopted the rule of reason to govern the enforcement of noncompetition covenants. *Pancake Realty Co. v. Harber*, 73 S.E.2d 438, 440–45 (W. Va. 1953). Once a contract is deemed valid and binding, the rule of reason determines the enforceability of any noncompetition covenant. *Reddy v. Comm. Health Found. of Man*, 298 S.E.2d 906, 915 (W. Va. 1982). Even if a contract is valid and binding, however, the court should approach restrictive covenants with "grave reservations." *Id.* The threshold question to ask is whether the covenant is reasonable on its face. *Id.* **Restrictive covenants include both noncompetition, nondisclosure and trade secrets covenants.** If the covenant is unreasonable on its face, it is utterly void and unenforceable. *See id.* ("No court should trouble itself to rewrite an inherently

unreasonable covenant to bring the covenant within the rule of reason."). An excessively broad covenant with respect to time or geographic scope is unreasonable on its face.[14] *Id.*

If I am satisfied that the covenant is reasonable on its face, I may proceed with the analysis leading to the "rule of best result." *Id.* at 916. In this analysis, the employer must prove it has a protectable business interest by "showing that [its] industry operates in such a way that [it] could be harmed by employees appropriating trade assets, and by *particularizing* for the court the trade assets susceptible of appropriation by the employee." *Id.* (emphasis added). The key inquiry in determining whether the employer has a protectable interest is "the extent to which the employee may unjustly enrich himself by appropriating an asset of the employer for which the employee has not paid and using it against that very employer." *Id.*

The covenant is presumptively enforceable in its entirety once the employer proves that it has an interest deserving of protection. *Id.* The employee then can rebut the presumption by showing he never had access to the particular trade secrets, the trade secret was actually his own, or the covenant unnecessarily overprotects the employer. *Id.* at 916–17. If the employee can

_____

[14]     In determining whether a covenant is unreasonable on its face, the court must keep in mind that it is a threshold question:

> Our courts should approach the available authority with respect to time and area limitations with caution. Most other courts fail to use the distinction we have adopted between a threshold inquiry as to the reasonableness of the covenant and a "rule of best result" within the general ambit of the rule of reason. Those courts use rule of reason language well past the threshold inquiry, and their standard of reasonableness for purposes of shaving the covenant to reasonable proportions should not be confused with a standard of "reasonableness on its face" for the purpose of deciding whether the covenant merits further scrutiny.

*Reddy v. Comm. Health Found. of Man*, 298 S.E.2d 906, 916 n.7 (W. Va. 1982).

demonstrate that the covenant should not be enforced in its entirety, then the court may tailor, or "blue pencil," the covenant's restrictions to comport with the equities of the case. *Id.* at 917.

The West Virginia Supreme Court of Appeals, after outlining this procedural analysis, cautions: "It is no doubt apparent to the reader at this point that we have not cleared up the swampy morass of conflicting interests and policies into which a court may eventually need to plunge to resolve the problems these covenants present." *Id.* The court continues, "We have, however, offered a structure that will allow both courts and litigants to narrow the possible issues to be decided in these cases, and, most importantly, we have established the order in which issues should be presented." *Id.* I must analyze the Nalco noncompetition **and nondisclosure** covenants using this structure.

### a. Reasonableness of the Noncompetition Covenant

I first must perform the threshold inquiry to determine if the **noncompetition** covenant is unreasonable on its face. The covenant reads:

> 5. Employee will not, directly or indirectly, during his employment and for the period of two (2) years immediately after its termination, engage or assist in the same or any similar line of business, competing with the line of business now or hereafter conducted or operated by Nalco during the term of Employee's employment by Nalco, whether as consultant, employee, officer, director, or representative of such competing business, within the United States of America, provided, however, that in the event that the Employee's position with Nalco immediately prior to termination is that of field representative, then the geographic area of this non-competition covenant shall be limited to that geographic area within the United States of America for which Employee was responsible at any time during the two year period immediately preceding termination, and provided, further that in the event that any court of competent jurisdiction shall find that the above restrictions are unreasonable with respect to their territorial extent and/or period of time involved, that such finding shall not invalidate any of the foregoing provisions with respect to the territorial extent or period of time which is reasonable, and said restrictions shall be construed to apply only to the territory and period of time so found to be reasonable by said court.

The covenant contains two different limitations on geographic area depending on the employee's classification "immediately prior" to termination. If the employee was a "field representative" at this time, the covenant restricts the employee from competing in the geographic area the employee was responsible for during the preceding two years. If, on the other hand, the employee was not a "field representative," the covenant restricts the employee from competing anywhere in the United States. Regardless of the classification of the employee, the covenant restricts the employee's competition for two years and does so by preventing the employee from engaging "in the same or any similar line of business" with Nalco.

After carefully reviewing the covenant, I **FIND** three major problems: 1) Nalco's reading of the term "field representative" renders the first part of the covenant meaningless, which surely was not Nalco's intent when drafting the agreement; 2) Mr. McGough likely was not a "field representative" immediately prior to resigning, which triggers the nationwide restriction; and 3) restricting competition "in the same or any similar line of business" that Nalco is in effectively prevents Mr. McGough from earning a living due to Nalco's presence in such a wide variety of industries.

Nalco does not have a position with the job title of "field representative." (Jan. 25 Hr'g Tr. 53:20.) According to David Brightbill, a regional manager for Nalco, a "field representative" is a term "used to designate anyone who represents Nalco in front of the customer." (*Id.* 7:13–14.) In his opinion, a field representative could be "anyone" with customer contact, including a marketing, research, technical, or sales employee. (*Id.* 7:20–24.) Mr. Brightbill stressed that because Mr. McGough had contact with customers "most every day" immediately prior to leaving Nalco, Mr. McGough was a field representative. (*Id.* 14:19.) He explained Nalco approaches customers with

42

a team of people including sales representatives, technical people, research people, and marketing people; as a result, Mr. Brightbill contends the term field representative is not limited to employees specializing in sales. (*Id.* 28:24–25, 29:1–3.)

According to Nalco's reading of the covenant, however, it is hard to conceive of employees who are not field representatives. When I asked Mr. Brightbill to name a Nalco employee that is not a field representative, he said that a "secretary wouldn't be a field representative." (*Id.* 40:25.) Presumably, janitors and maintenance men also are not field representatives, but it is illogical to assume that these were the kinds of positions Nalco intended to cover in the first part of the Field Representative Agreement. By first contemplating a nationwide restriction and then providing an exception for field representatives, the contract certainly contemplates that some employees will not be field representatives. Because the restriction is larger for employees not field representatives, I can only conclude that this part of the covenant is intended to cover employees superior to field representatives who conduct business in a larger area.

Mr. McGough contends he was never referred to as a field representative while working at Nalco. (*Id.* 149:8.) According to him, he understands a field representative to be any employee working in the field under a district sales manager. (*Id.* 149:15–18.) Larry Hyatt also agrees with this reading and stated he understands a field representative to be a district manager or someone reporting to a district manager. (*Id.* 213:1–3.) According to Mr. McGough, he was a field representative while working in sales—in Alabama and in West Virginia under Mr. Hyatt. When he became an industry technical consultant, however, and began reporting through Nalco's marketing branch as opposed to its sales branch, he was no longer a field representative.

The Field Representative Agreement is a fine example of a poorly drafted agreement. The fact it is not tailored to a particular person or a particular job causes major problems, as explained throughout this opinion. *See also Nalco Chem. Co. v. Hydro Techs, Inc.*, 984 F.2d 801, 802 (7th Cir. 1993) (expressing concern over this same Field Representative Agreement because it is not tied to a particular job). It carves out an exception to a nationwide restriction for field representatives, but never provides any indication of what a field representative is. Based upon the testimony heard at the hearing and the fact Nalco's reading of the term renders the nationwide restriction meaningless, I construe the term more narrowly than Nalco. Because I read the term more narrowly than Nalco, I am likely to find that Mr. McGough was not a "field representative" immediately prior to leaving the company. Accordingly, the nationwide restriction applies to him, and although some noncompetition covenants restraining competition throughout the country have been upheld, enforcing the nationwide restriction in this case likely would be unreasonable.

The covenant also restricts employees from working "in the same or any similar line of business" as Nalco. The covenant is not limited to the same line of business in which the particular employee actually works, but is written so expansively to encompass any lines of business in which Nalco is involved. This restriction effectively would bar Mr. McGough from working in any facet of the water treatment business, even those areas in which he did not work while a Nalco employee. As a result, the restriction offends the rule of reason. *See id.* at 805 (finding this same noncompetition agreement unenforceable under Wisconsin law because its restrictions are greater than necessary to protect Nalco's legitimate interests).

These major problems likely cause the covenant to be unreasonable on its face. As a result, it is unnecessary to continue the structured analysis by asking if Nalco proved it has a protectable

business interest. Also, because the covenant is likely unreasonable on its face, I will not "blue pencil" the covenant to conform it with the rule of reason. Accordingly, I **FIND** I am unlikely to enforce the provisions of the noncompetition covenant.

b.    *Reasonableness of the Nondisclosure Covenants*

As with the noncompetition covenant, I first look at the nondisclosure covenants to determine whether they are unreasonable on their face. The covenants read:

> **2. Employee shall not, directly or indirectly, under any circumstances or at any time, either during his employment by Nalco or after its termination, communicate or disclose to any person, firm, association or corporation, or use for his own account, without Nalco's consent, any information acquired by him in the course of, or incident to his employment, relating to or regarding any inventions, discoveries, improvements, machines, devices, processes, products, formulae, designs, projects, mixtures and/or compounds, whether patentable or not (hereinafter collectively called "technical information") that may have been, are now, or may hereafter during the term of his employment by Nalco be made, used, devised, considered or investigated by Nalco or Third Parties, and he will at all time keep secret and hold inviolate said technical information, the Employee hereby agreeing that all the foregoing has been and shall be received by him as confidential communications: provided, however, that the obligations of this paragraph shall not apply in the event and to the extent that the aforesaid matters are or become generally known to and available for use by the public otherwise than by the act or commission of Employee, except that Employee shall in no event, at any time, without Nalco's consent, disclose any identity or correlation between matters publicly known and available and Nalco's technical information or said Third Parties' technical information.**
>
> **3. Employee shall not, directly or indirectly, under any circumstances or at any time, either during the term of his employment or after its termination, communicate or disclose to any person, firm, association or corporation, or use for his own account, without Nalco's consent, any information acquired by him in the course of or incident to his employment relating to or regarding the names of customers of Nalco or Third Parties, the sales or service data of Nalco or Third Parties, furnished to him or secured by him in the course of his employment, or any other data or information concerning the business and activities of Nalco or Third Parties.**

45

Covenants not to disclose and utilize confidential business information are related to general covenants not to compete because of the similar employer interest in maintaining competitive advantage. The reasonableness of specific nondisclosure clauses turns on factors of time and the nature of the business interest sought to be protected. *See Durham v. Stand-by Labor of Georgia, Inc.*, 198 S.E.2d 145, 149 (1973) (citing Blake, Employee Agreements Not to Compete, 73 Harv. L. Rev. 625, 648 (1960)). Courts have found nondisclosure provisions that contain no time limitation to be unenforceable. *See, e.g., Thomas v. Best Manufacturing Corp.*, 218 S.E.2d 68 (Ga. 1975); *Howard Schultz & Assoc. of the Southeast, Inc. v. Broniec*, 236 S.E.2d 265 (Ga. 1977).

In deciding whether restraints on disclosure are reasonable two factors are important: (1) whether the employer is attempting to protect confidential information related to the business, such as trade secrets, methods of operation, names of customers, and personnel data even though the information does not rise to the statute of a trade secret, and (2) whether the restraint is reasonably related to the protection of the information. *See* Restatement of Contracts § § 515(a), 516.

The covenants at issue here are broad both as to time and as to the information falling within the scope of the covenants. Almost all of the information Mr. McGough acquired during his years working at Nalco would fall within the definitions of confidential information described in clauses two and three. By defining confidential information as essentially all of the information provided to Mr. McGough during his employment, the nondisclosure covenants amount to a post-employment covenant not to compete that is completely unrestricted in duration or geographic scope. *See Service Centers of Chicago, Inc. v. Minogue*,

46

535 N.E.2d 1132, 1137 (Ill. 1989). Because the nondisclosure covenants forbid Mr. McGough from using knowledge gained during the course of employment, these covenants are for all purposes, covenants not to compete. *See Nucor v. Bell*, – F. Supp. 2d –, 2007 WL 1020842 (D.S.C. 2007). Therefore these covenants are subjected to the same scrutiny as the covenant not to compete. Having found that I am unlikely to enforce the noncompetition agreement, I also FIND that the nondisclosure provisions are unlikely to be enforceable. Neither provision contains a time limitation. The provisions are written so broadly as to cover everything Mr. McGough might have learned while working at Nalco, if he were to strictly abide by its terms, he would be unable to ever work in a similar field again. I FIND that I am unlikely to enforce these provisions as a matter of law.

### III. Conclusion

Simply stated, if this agreement is enforceable, Mr. McGough likely breached it by competing directly with Nalco immediately after his resignation. I, however, am unlikely to enforce the agreement for two reasons. First, it is not equitable to enforce a noncompetition covenant like the one at issue in this case under these facts. **Nor would it be equitable to enforce the nondisclosure provisions which essentially functions as noncompetition provisions under the facts of this case.** Second, even if I would likely enforce the agreement in equity, the terms of the noncompetition covenant **and the nondisclosure covenants** at issue are likely to be unenforceable becuase the covenants **are** likely unreasonable on **their** face. **Furthermore the lack of time restrictions or specificity as to the protectable information in the nondisclosure provisions likely makes them unreasonable on their face as well.** Nalco's extremely broad reading of the term "field representative" cannot be sustained and Mr. McGough likely was not a "field

representative" immediately prior to leaving the company when he was an industry technical consultant. As a result, the nationwide restriction, which is most likely to be found unreasonable in this case, applies to him.

Because the balance of hardships are in virtual equipoise, the likelihood Nalco will be successful on the merits becomes the dispositive issue of this motion. Finding the likelihood of success on the merits to be very low, I **DENY** Nalco's motion for a preliminary injunction.

The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:    July 2, 2007

JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE